UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN THE MATTER OF THE USE OF A CELL-SITE SIMULATOR TO IDENTIFY THE CELLULAR DEVICE(S) CARRIED BY FRANLY FRANCISCO HERRERA-HERRERA | Case No. 22-1527-DLC<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Special Agent Casey MacDonald, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.  I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 to authorize law enforcement to employ an electronic investigative technique involving a "cell site simulator" further described in Attachment B, in order to identify the cellular device or devices carried by Franly Francisco Herrera-Herrera (Herrera) described in Attachment A [the "Target Device(s)"].

2.  I am a Special Agent with the United States Drug Enforcement Administration ("DEA") and have been so employed since 2014. I graduated from the DEA Special Agent Academy, where I was trained in drug investigations, narcotic identification, search warrants, undercover techniques, surveillance, debriefing of informants, and other investigative procedures. I am currently assigned to the Southern New Hampshire DEA's High Intensity Drug Trafficking Area Task Force. Prior to joining the DEA, I spent four years as an Officer with the United States Secret Service Uniformed Division. I hold a Master's degree in Criminal Justice from the University of Massachusetts. My duties and responsibilities include the investigation of federal crimes, including violations of 21 U.S.C. §§ 846 and 841(a)(1).

3. I have received significant training in the field of narcotics enforcement and investigations. Through my training, education, and experience, I have become familiar with the manner in which drug trafficking organizations ("DTOs") conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement. In the course of participating in investigations of DTOs, I have conducted or participated in surveillance, the purchase of illegal drugs, the execution of search warrants, debriefings of subjects, witnesses, and confidential informants, and reviews of consensually recorded conversations, meetings, and Title III intercepts. In preparation for writing this affidavit, I have prepared reports and reviewed reports prepared by other investigators regarding witness interviews, surveillance, and other investigative efforts regarding this investigation. In addition, I have discussed this investigation with other officers involved in the case. Through my conversations with other officers and my analysis of reports prepared by other officers, I am familiar with all aspects of this investigation. The information contained in this affidavit is submitted for the sole purpose of supplying probable cause for the issuance of a warrant authorizing the use of a cell site simulator in order to identify the Target Device(s). While this affidavit contains all the material information I am aware of that is pertinent to the requested search warrant, it does not set forth all of my knowledge about this matter.

4. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846 have been committed, are being committed, and will be committed by HERRERA. There is also probable cause to believe that the identity of the Target Device(s) will constitute, and lead to additional, evidence of those

criminal violations. There is probable cause to believe that the use of the investigative technique described herein will result in officers identifying the Target Device(s).

5.      Because collecting the information authorized by these warrants may fall within the statutory definitions of a "pen register" or a "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is intended to comply with the Pen Register Statute as well as Rule 41. See 18 U.S.C. §§ 3121-3127. This application therefore includes all the information required to be included in a pen register order. See 18 U.S.C. § 3123(b)(1).

**INFORMATION REGARDING USE**

**OF THE CUSTOMER TELEPHONE IN CRIMINAL ACTIVITY**

6.      Agents in the District of New Hampshire currently are investigating a fentanyl trafficking organization operating in Lawrence, Massachusetts. On August 31, 2022, agents seized approximately 600 grams of fentanyl from a drug trafficker operating in New Hampshire and Vermont. As a result of this seizure, agents obtained a confidential source (hereinafter "CS") who has made multiple statements against its own interest about the CS' own participation in the importation and distribution of fentanyl in New Hampshire. The CS is cooperating to receive consideration regarding future charges that would result from the above aforementioned seizure. The CS has multiple state misdemeanor convictions which include theft by unauthorized taking, theft without owners consent and hindering apprehension.

7.      Since the CS began cooperating in August 2022, the CS has provided information to law enforcement about its fentanyl source of supply and its narcotics customers.  The CS, to my knowledge, has not previously provided information to other law enforcement agencies. As of this writing, I have corroborated much of the CS's information and consider the CS to be reliable. Agents have met with the CS on two occasions and independently verified the

information regarding the source of supply through a controlled purchase, phone record examinations, and surveillance observations.

8.  While meeting with the CS in August 2022, the CS relayed that its fentanyl source was a Hispanic male that lived in Lawrence, Massachusetts. The CS did not know the real name of the drug trafficker, but referred to him as "ANTONY." The CS stated that for the last two years, it has been buying fentanyl for approximately $10 per gram from ANTONY and his runners. The CS stated that it would typically purchase 400-500 grams bi-weekly from one of ANTONY's runners in the Lawrence area. The CS stated that it would typically send text messages to the Customer Telephone, telling the dealer when it needed more fentanyl. The CS would tell the dealer the approximate time it would travel to Lawrence and how much fentanyl it needed. ANTONY would then tell the CS to travel to one of several locations where it would meet with a runner to complete the drug sale.

9.  At approximately 10:00 a.m. on September 7, 2022, under the direction of agents, the CS sent several text messages to the Customer Telephone:

- **CS**: Yo I need to get 15 for a client can I pay you 500 of what I owe and get 15 sticks for $2000? I will pay the other $1,000 when I come for a big amount next week.

- **Customer Telephone**: Ok Bro

- **CS**: Thank you bro I will message you when I am on my way

During this exchange, the CS was able to arrange the purchase of 150 grams of fentanyl for $2,000.  Later in the day, agents met with the CS and provided the CS with $2,000 in Official Advanced Funds (OAF). The CS was outfitted with audio and video recording equipment and

given instructions. The CS and its vehicle were searched by TFO Judd and TFO Hamel for contraband with negative results.

10. At the directions of agents, the CS then placed several more text messages to the Customer Telephone to arrange the drug deal:

- **CS:** Im stopping back in Salem nh I'm 30 minutes away.
- **Customer Telephone:** Ok
- **CS:** Im 10 min away. Where am I going?
- **Customer Telephone:** Diamond
- **CS:** Ok. Message when I there.

The CS was then escorted by TFO Judd and TFO Hamel to Diamond Street in Lawrence, MA. Once parked, the CS observed a Hispanic male driving on a motorized scooter in the area around it. The CS recognized the Hispanic male as a runner that it had bought fentanyl from in the past. The CS texted the Customer Telephone "here" and the Customer Telephone replied "ok." A few minutes later, TFO Hannigan, who was conducting surveillance in the area, observed the Hispanic male drive the scooter to the CS vehicle and then pass the CS a black bag of suspected fentanyl. The CS gave the Hispanic male the $2,000 in OAF and then departed. The CS was followed back to a predetermined meet location by TFO Judd and Hamel where it immediately surrendered the suspected fentanyl. The CS and its vehicle were searched for contraband with negative results. The CS texted the Customer Telephone "Tha K you ill be back next week" and the Customer Telephone replied "ok bro." After the controlled purchase, agents attempted to follow the runner on the scooter. However, surveillance lost the runner in the area of Belknap Street.

11. Later on September 7, 2022, after the controlled purchase with the CS, law enforcement remained in the area of 10 Diamond Street and conducted surveillance. At approximately 4:10 p.m., TFO Hannigan observed a silver Buick with New Hampshire registration back into the same parking spot that the CS used earlier that day. Two white males occupied this vehicle and it remained idling while parked. This vehicle was registered out of Lisbon, New Hampshire, which is approximately 2 hours and thirty minutes north of Lawrence, Massachusetts. Approximately three minutes after the Buick parked, I observed the same scooter used in the drug purchase by the CS arrive in the lot, driven by a different Hispanic male. This Hispanic male drove the scooter up a one-way street, directly to the area of the silver Buick and did a circuitous loop around the parking lot in a suspected attempt at counter surveillance. TFO Hannigan then observed the Hispanic male drive around the rear of the silver Buick, duck down, and walk to the passenger-side window. The Hispanic male reached in and exchanged an unknown item with the passenger. The Hispanic male then departed on the scooter in the same direction from which he initially arrived.

12. After the exchange, the silver Buick left the parking lot and drove directly to Route 93 north, followed by agents. After a short time, agents contacted New Hampshire State Police and had the vehicle stopped just north of Exit 5 in New Hampshire. During this motor vehicle stop, the passenger, Brian Mains, admitted to agents that he had gone to 10 Diamond Street, Lawrence, to buy fentanyl. Mains provided law enforcement with approximately 40 grams of fentanyl which he had in his possession. Mains stated that a Dominican male driving a scooter gave him the drugs through his truck window. Mains said that this drug sale was arranged with someone called "papa" or "flacco" through the Customer Telephone. Mains said that for approximately one year, he arranged with the Customer Telephone to buy 50-60 grams

of fentanyl weekly for $100 per ten grams. Mains said that when making these drug sale arrangements, he would call the Customer Telephone and the sale would usually happen in specific locations. The drug sale locations were the same locations that the CS previously provided as the locations where it arranged to buy drugs from "ANTONY." Mains provided his password and consented to a search of his telephone, which he used to contact the Customer Telephone. Mains was later arrested by New Hampshire State Police for an outstanding warrant.

13. I searched Mains' telephone and confirmed that it had been used to arrange fentanyl sales with the Customer Telephone. In less than a month, the message history with the Customer Telephone showed approximately seven drug deals. In sum during those seven deals, Mains contacted the Customer Telephone and arranged the purchase of approximately 310 grams of fentanyl. Mains also discussed providing several other New Hampshire drug customers to the user of the Customer Telephone as well as trading a scale for more drugs.

14. On September 26, 2022, under the direction of agents, the CS made contact with the Customer Telephone and set up another fentanyl purchase:

- **CS**: Yo I have the 1,000 I owe you and need to come down tomorrow
- **Customer Telephone**: How much. Bro. Money Tomorrow
- **CS**: 3500 Total
- **CS**: Ill message you when I leave my house.
- **Customer Telephone**: ok

15. The following day, agents met with the CS at a pre-determined meet location and advised it that it would be bringing an undercover officer ("UC") during the deal. The CS was searched for contraband with negative results. The CS then reached out to the Customer Telephone again:

- **CS**: Hey I'm 30 min away. Stipping at bank imin a blue ford f150 with NH plate. Ill text you when I 10 min away.
- **Customer Telephone**: ok. How long bro
- **CS**: 20 min im at bank in salem
- **CS**: Im 10 min away wher am I going?
- **Customer Telephone**: Ok. Diamond. Bro

16. Agents established surveillance in the area of 10 Diamond Street in Lawrence and waited for the CS and UC to arrive. At approximately 2:27 p.m., the UC and CS arrived and parked in the rear of 10 Diamond Street. Approximately three minutes later, the same runner from the previous CS deal arrived on a motorized scooter. The runner did several loops in an obvious attempt at counter surveillance, then approached the CS at the passenger side of the UC vehicle. The runner passed the CS a red rectangular package with the number "30" on it, along with a smaller package of white powder. At the end of the drug transaction, the UC and CS returned to a predetermined meeting location and the vehicle was searched for contraband with negative results other than the drugs purchased during the deal. The purchased drugs were sent to the DEA Northeastern Regional Laboratory and on October 18, 2022 were confirmed to be approximately 362 grams of Fentanyl.

17. After the drug purchase, the UC directly contacted the Customer Telephone. During this exchange, the UC told the person using the Customer Telephone that he had been with the CS during the drug purchase earlier that day and wished to personally buy from the Customer Telephone. After vetting the UC with the CS, the Customer Telephone user agreed to do business with the UC at a later date.

18. On September 23, 2022, United States Magistrate Judge Andrea K. Johnstone authorized a precise location warrant (also known as a "ping") for the Customer Telephone. This ping was activated by T-Mobile USA on September 28, 2022 for a period of 30 days. On October 28, 2022, Magistrate Judge Johnstone again ordered the Ping of the Customer Telephone for a period of 30 days.

19. Since approximately September 28, 2022, the Customer Telephone is primarily spending the overnight hours in the area of 119 Webster Street, Haverhill, MA. However, during the daytime hours, it was located in the immediate area of 120 Broadway Street, Lawrence, MA. KUTZ Barbershop is located at 120 Broadway Street.

20. On October 3, 2022, the Undercover (UC) texted the Customer Telephone. During this message exchange, the UC and Customer Telephone user planned a drug deal for the following day for $500. On the following day, the UC again contacted the Customer Telephone and had the following exchange over a period of a few hours:

- **UC**: Hey bro ill be down in about 3hours
- **Customer Telephone**: ok. 500$?
- **UC**: 500
- **Customer Telephone**: ok
- **UC**: Hey bro ill be there in 30 min

9

- **Customer Telephone**: ok

21.     Agents then set up surveillance in the Diamond Street area of Lawrence, where the CS deals had previously occurred. The UC again contacted the Customer Telephone and told him that he was 10 minutes away. The Customer Telephone user told him to go to "11 Diamond."

22.     I established surveillance in the area and observed the same Hispanic male runner from the previous drug purchase with the CS. The Runner was riding the same motorized scooter and was conducting counter-surveillance in the parking lot of Diamond Street by looking into vehicles and doing laps inside the lot. A short time later, the UC parked and the runner parked the scooter close by. The runner walked by the UC and gestured for him to follow the runner into the building. The UC followed and conducted the fentanyl transaction with the runner inside. The runner and UC exited the building shortly after and then both departed.

23.     On October 6, 2022 at approximately 10:00 a.m., I established surveillance in the area of 120 Broadway Street, Lawrence, Massachusetts. At approximately 11:22 a.m., I observed HERRERA, positively identified by investigators during a motor vehicle stop on October 14, 2022, arrive at the address in the area of Kutz Barbershop. HERRERA joined several other men standing in front of KUTZ Barbershop. At approximately the same time, I confirmed that the ping on the Customer Telephone had moved from the Haverhill area and was now within an 88-meter radius of KUTZ Barbershop. While HERRERA was standing in the group, I watched him use two different cell phones multiple times. Approximately one hour later, HERRERA was joined by the Hispanic male runner that has been selling fentanyl to the UC and to the CS. This

runner was riding the same motorized scooter used during those drug transactions. HERRERA and the runner separated from the group and had a private conversation further down the block.

24. At approximately 1:06 p.m., I observed HERRERA and the runner move back to the area of KUTZ Barbershop. At that time, I placed a phone call to the Customer Telephone and watched HERRERA answer his telephone. At that time, I heard a male voice say "Hello" which corresponded with HERRERA speaking into his telephone. At that time I ended the call and subsequently watched HERRERA take the telephone down from his ear. HERRERA looked at the screen and then placed the phone back into his pocket. HERRERA then took out another telephone from his other pocket and checked the screen on that, before putting it away. In my training and experience, drug traffickers will often utilize multiple phones in order to insulate themselves from law enforcement.

25. On October 13, 2022, law enforcement observed the ping location for the Customer Telephone in the Portland, Maine area. It had spent the overnight hours in the area of the Ramada Hotel in Portland, Maine. Agents traveled to Portland and located a 2015 Black Jeep Cherokee registered to Grimeilys ARIAS's parked in the Ramada lot. ARIAS is HERRERA'S significant other.

26. On the same date, the Customer Telephone user texted the UC and asked, "Do you know of any people up in Maine who have good business?" The UC stated that he might have a few people and that he would check. The Customer Telephone user told the UC to send him their numbers and offered to pay the UC for any business that he does with the UC's referrals. The UC affirmed and told the Customer Telephone user that he would message him back.

27. In my training and experience, drug traffickers will often ask their current customers for more drug associates that are looking to buy fentanyl. On this instance, I believe HERRERA was looking for drug associates that the UC knew in Portland. I also believe that HERRERA was willing to pay the UC in either drugs or money for any future drug deals that he did with his associates. After this aforementioned exchange, agents attempted to introduce another undercover officer (UC2) to HERRERA through the UC already in contact.

28. While initially the Customer Telephone user questioned whether UC2 was law enforcement, the Customer Telephone user eventually continued to talk to UC about UC2. The Customer Telephone user asked UC how much UC2 would purchase. The UC said that he would purchase approximately 5-50 fingers at a time. In a simultaneous text conversation from the Customer Telephone, the user resumed contact with UC2. During this conversation, the Customer Telephone user asked how many fingers UC2 buys per week. UC2 said he buys ten fingers on the low end, but usually 45-50 fingers at a time. The Customer Telephone user asked how much he pays for the fingers and UC2 said $150 each. The Customer Telephone user asked UC2 how much he wanted and told him that he was going to be "going to Lawrence today." UC2 told the Customer Telephone user that they could meet at a later time. The Customer Telephone user said that he will be waiting for UC2 to contact him.

29. On October 14, 2022, HERRERA was positively identified during the previously mentioned traffic stop driving Arias's Jeep. The ping for the Customer Telephone remained in the area of the traffic stop, confirming that it was with HERRERA. The Customer Telephone then traveled back to Lawrence to the area of KUTZ Barbershop.

30. I believe that HERRERA controls the Customer Telephone and is responsible for taking and orchestrating the drug orders made by the DEA and other customers using the

Customer Telephone. However, the toll records for the Customer Telephone do not indicate that he is using it to talk to his runners. For instance, during the drug transaction on September 7, 2022, the CS was waiting for drugs from the runner, who was within five feet of the CS's car. However, the DEA airwing was providing air surveillance and the runner looked up and pointed directly at the aircraft. The runner then took his own phone out of his pocket and placed a call to an unknown person. After approximately one minute, the runner put the telephone away and then sold the suspected fentanyl to the CS. Based on my training and experience, I know that drug runners often alert their "boss" of possible law enforcement presence before ultimately completing a drug sale. In this instance, I believe that the runner called HERRERA and HERRERA gave the runner permission to complete the deal. However, toll records for the Customer Telephone did not show any communications during this time that would correspond with a conversation with the runner.

31. Although controlled purchases and surveillance have allowed law enforcement to identify HERRERA, it has not led to the identification of his runners. HERRERA has compartmentalized communications between the Customer Telephone and at least one other device that he has been observed using regularly. For instance, on November 18, 2022, I observed HERRERA alternating both devices while he was in front of his Haverhill residence. HERRERA will often rotate between the Target Device and the Customer Telephone in quick succession. I believe that this other device is being used to orchestrate other facets of his drug enterprise and its identification is pivotal to the success of this investigation. Records about the Target Device(s) could help to identify other potential suspects involved in the Target Offenses. Its identification could also eventually help investigators obtain more accurate location information than the Customer Telephone. Currently, the pings for the Customer Telephone have

a large variation in accuracy. Depending on the type of carrier and hardware used by the Target Device(s), a future ping of the identified Target Device(s) could allow investigators to pinpoint HERRERA's day to day travels with greater accuracy.

## MANNER OF EXECUTION

32. In my training and experience, I have learned that cellular phones and other cellular devices communicate wirelessly across a network of cellular infrastructure, including towers that route and connect individual communications. When sending or receiving a communication, a cellular device broadcasts certain signals to the cellular tower that is routing its communication. These signals include a cellular device's unique identifiers.

33. Law enforcement may use an investigative device known as a cell site simulator (sometimes referred to by the names Stingray or Triggerfish) that sends signals to nearby cellular devices, including the Target Device(s), and in reply, the nearby cellular devices will broadcast signals that include their unique identifiers. The investigative device may function in some respects like a cellular tower, except that it will not be connected to the cellular network and cannot be used to enable a mobile device to communicate with others. Law enforcement will use this investigative device when they have reason to believe that HERRERA is present. Law enforcement will collect the identifiers emitted by cellular devices in the immediate vicinity when HERRERA is in multiple locations and/or multiple times at a common location and use this information to identify the Target Device(s), as only the Target Device(s)' unique identifiers will be present in all or nearly all locations. Once investigators ascertain the identity of the Target Device(s), they will cease using the investigative technique. Because there is probable cause to determine the identity of the Target Device(s), there is probable cause to use the investigative technique described herein.

34.     The investigative device may interrupt cellular service of cellular devices within its immediate vicinity. Any service disruption will be brief and temporary, and all operations will attempt to limit the interference of cellular devices. Once law enforcement has identified the Target Device(s), it will delete all information concerning non-targeted cellular devices. Absent further order of the court, law enforcement will make no investigative use of information concerning non-targeted cellular devices other than distinguishing the Target Device(s) from all other devices.

## AUTHORIZATION REQUEST

35.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41. The proposed warrant also will function as a pen register order under 18 U.S.C. § 3123.

36.     This Court has authority to issue the requested warrant under Federal Rule of Criminal Procedure 41(b)(1) because the electronic investigative technique will be employed within the District of Massachusetts at a time when the Target Device(s) are known to be present within the District of Massachusetts.

37.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice for 30 days from the issuance of the warrant. This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the person carrying the Target Device(s) would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates,

and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). There is reasonable necessity for the use of the technique described above, for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

38. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to identify the Target Device(s) outside of daytime hours.

I declare that the foregoing is true and correct.

/s/ Casey MacDonald
Casey T. MacDonald
Special Agent
U.S. DRUG ENFORCEMENT ADMINISTRATION

Subscribed and sworn to telephonically this 23rd day of November 2022.



_____
HON. DONALD L. CABELL
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

To ensure technical compliance with the Pen Register Statute, 18 U.S.C. §§ 3121-3127, this warrant also functions as a pen register order. Consistent with the requirement for an application for a pen register order, I certify that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by Drug Enforcement Administration. *See* 18 U.S.C. §§ 3122(b), 3123(b).

s/ Brian A. Fogerty
BRIAN A. FOGERTY
ASSISTANT U.S. ATTORNEY
DISTRICT OF MASSACHUSETTS